Filed 2/27/25  P. v. Harris CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B327052 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA023031) |
| v. | |
| CALEB JAMES HARRIS et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County, Laura C. Ellison, Judge.  Affirmed as to Dwayne Arthur Moore.  Reversed and remanded with instructions as to Caleb James Harris.

Juvenile Innocence & Fair Sentencing Clinic, Loyola Law School, Sean Kennedy, Christopher Hawthorne and Jason Mayland for Defendant and Appellant Caleb James Harris.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant Dwayne Arthur Moore.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael C. Keller, John Yang, and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

––––––––––––––––––––

## INTRODUCTION

Dwayne Moore and Caleb James Harris appeal from the denial of their separate petitions for resentencing under Penal Code section 1172.6.[1]

After appointing counsel and reviewing the parties' briefing, the superior court denied Moore's petition at the prima facie stage without issuing an order to show cause because it concluded the record of conviction established Moore was the actual killer. Moore contends the record of conviction does not establish he was ineligible for relief as a matter of law, and the superior court engaged in improper judicial factfinding. We affirm the denial of Moore's section 1172.6 petition.

A different panel of this court previously reversed the superior court's denial of Harris's section 1172.6 petition at the prima facie stage and remanded for an evidentiary hearing. After holding the evidentiary hearing, the superior court denied Harris's petition for resentencing. The court found the People met their burden to prove beyond a reasonable doubt Harris was guilty of murder under current law. Harris contends the superior court prejudicially erred when it excluded newly available

––––––––––––––––––––

[1] All further statutory references are to the Penal Code unless otherwise specified.

2

eyewitness testimony, relied on inadmissible hearsay testimony, and failed to consider Harris's youth in its decision. We conclude the superior court abused its discretion when it excluded the new eyewitness testimony proffered by Harris, and that Harris has demonstrated he was prejudiced. We reverse the denial of Harris's petition and remand for a new evidentiary hearing. We decline Harris's request to transfer the matter to a different judge on remand.

## FACTUAL AND PROCEDURAL HISTORY[2]

A.    *Valerie Rivers's Apartment Is Firebombed*

On January 26, 1995, Valerie Rivers was in labor and waiting for her mother to take her to the hospital when Moore, someone she had known for many years, arrived at her home. A neighbor, who was there to watch Rivers's two-year old son, let Moore into the apartment. Without asking for permission, Moore used Rivers's landline telephone. Moore was told he could not use the phone at that time, but he continued with the call. When he was done, Moore mocked Rivers and left. Rivers gave birth at the hospital later that day.

On January 28, 1995, when Rivers returned to her apartment after her hospital stay, her then-boyfriend was asleep

---

[2]    In this opinion, we provide an abbreviated factual background. Detailed descriptions of the evidence are provided in our previous opinions from the direct appeals. (*People v. Moore* (July 17, 2000, B112631) [nonpub. opn.]; *People v. Harris* (Dec. 17, 1998, B118894) [nonpub. opn.].) We additionally grant Harris's request for judicial notice of the reporter's transcripts from the second and third trials as well as the hearings from the petitions for resentencing.

in her bedroom.  She stepped outside to confront Moore about "disrespecting" her on January 26 when she was in labor.  As they argued, Rivers's boyfriend came outside and pointed a gun at Moore.  Moore began to cry and asked Rivers, "You gonna let him do this to me?"  Rivers's boyfriend eventually went back into the apartment with Rivers.  Moore's friends, Charles Lewis and Bobby Freeman, witnessed the incident.

Later the same day, Eric Bowden saw Moore at an apartment building located on Eucalyptus Avenue.  Harris's sister lived in that apartment building with her boyfriend, Cleveland Mouton.  Bowden and Harris often stayed at Mouton's apartment.  Harris was also at the Eucalyptus Avenue apartments that day.  Freeman lived in the building next door, and a dozen or so people frequently congregated in the carport in between the two buildings.  Bowden testified that "everybody" was teasing Moore about the incident with Rivers's boyfriend.  Bowden told detectives he saw Moore and Harris fill beer bottles with gasoline and put cut-up bedsheets into the bottles.[3]  Moore and Harris left the apartment complex around 8:00 p.m.

At approximately 8:30 p.m. that evening, Rivers heard people talking outside her apartment.  She was in the bedroom with her children.  A man whose voice she could not identify said, "If the home girl is cool and she got kids, then I wouldn't fuck with her.  But if she—if she's not, then fuck it.  Whatever."

---

[3]  At the first trial, Bowden recanted his prior statements to the police.  Bowden explained he had simply repeated what the police told him and had lied out of fear because the investigating officer said he was a suspect.  The prosecutor subsequently impeached Bowden with his preliminary hearing testimony and his prior statements to the police.

4

Rivers then heard a voice she recognized as Moore's respond, "I'm not going out like that. Meet me back here in 30 minutes." Less than 30 minutes later, Rivers heard Moore call her by name, "Valerie." A "ball of fire" was then thrown through her bedroom window. It hit Rivers in the face and she ran to the bathroom to put it out. Rivers attempted to reach her children, but the bedroom was quickly engulfed in flames. Rivers suffered severe burns, requiring multiple skin grafts, and was hospitalized for two months. Both her children died as a result of the fire.

Robert Alcaraz, Jr., testified he was waiting in his car for a friend when he saw two young Black men in dark, loose clothing outside Rivers's apartment light a rag and throw an object through the window. Alcaraz saw a flame and heard the sound of breaking glass. The two men ran off. Neither Alcaraz nor his friend identified Harris as one of the two men outside Rivers's apartment building that night. Alcaraz's friend had previously lived in the area and knew Moore. The friend testified she saw Moore standing outside Rivers's apartment building with one or two others when she arrived with Alcaraz. Bowden testified Harris later told Bowden he went over to Rivers's apartment but had not thrown the Molotov cocktail.

Moore and Harris were charged by information on June 1, 1995 with two counts of first degree murder of Rivers's children (counts 1 and 2; § 187, subd. (a)), one count of attempted murder of Rivers (count 3; §§ 664/187, subd. (a)), and one count of arson causing great bodily injury (count 4; § 451, subd. (a)). The information further alleged as special circumstances that the murders were committed by means of a destructive device (§ 190.2, subd. (a)(6)), were committed during the commission of arson (§ 190.2, subd. (a)(17)), and constituted multiple murders

5

(§ 190.2, subd. (a)(3)).  It was also alleged the attempted murder was willful, deliberate, and premeditated (§ 664, subd. (a)) and committed with the intent to personally inflict great bodily injury (§ 12022.7, subd. (a)).

Moore and Harris were tried together.  The jury was unable to reach a verdict as to either defendant, and the court declared a mistrial.  Moore was subsequently convicted in a second trial, but the jury failed to reach a verdict as to Harris.  Harris was convicted in a third trial.  We discuss Moore's second and Harris's third trial in greater detail below.

B.    *The Jury Finds Moore Guilty on All Counts at the Second Trial*

At the second trial, Moore and Harris were again tried together.  But this time, Bowden was unavailable to testify, and the People read his testimony from the first trial into the record, including the testimony from the preliminary hearing and his statements to the police that were used to impeach him.

As relevant here, for counts 1 and 2 involving the children, the court instructed the jury on first degree malice murder and felony murder, and aiding and abetting liability.  The court did not instruct the jury on the natural and probable consequences doctrine.  The court further instructed the jury on three special circumstance allegations, i.e., murder during the commission of arson, murder by means of destructive device, and multiple murders.  The introductory instruction on the special circumstance allegations advised the jury that if they found the defendant to be the actual killer, they did not have to find an intent to kill but if they found he was not the actual killer, they could not find true the special circumstances unless they also

6

found the defendant harbored an intent to kill as an aider or abettor or that he was a major participant in the underlying felony who acted with reckless indifference to human life.

The jury was instructed on attempted willful, deliberate, and premeditated murder of Rivers for count 3, which required a finding that the defendant acted with malice. The jury was also instructed on the intentional infliction of great bodily injury enhancement attendant to the attempted murder count, which required the jury to determine whether the defendant, with the specific intent to inflict injury, did personally inflict great bodily injury on Rivers.

On November 14, 1996, the jury found Moore guilty as charged on all four counts. The People sought the death penalty for Moore but after a penalty phase trial, the jury announced it was hopelessly deadlocked on the penalty verdict. The prosecution announced it would not retry the penalty phase.

Moore's motions for new trial and to reduce the judgment were denied. The trial court sentenced Moore to consecutive terms of life in prison without the possibility of parole for the first degree murders in counts 1 and 2 and a consecutive term of life in prison with the possibility of parole for the premeditated attempted murder plus three years for the great bodily injury enhancement in count 3. The prison term in count 4 was stayed pursuant to section 654. Moore appealed, and we affirmed. (*People v. Moore* (July 17, 2000, B112631) [nonpub. opn.].)

C.      *Harris Is Convicted of Murder and Arson at a Third Trial*
A second mistrial was declared as to Harris when the jury was unable to reach a verdict. The People retried Harris. At Harris's third trial, the People once again read Bowden's

7

testimony into the record because Bowden was unavailable as a witness. The jury heard him repudiate his statements to the police identifying Harris as one of the individuals who made the Molotov cocktails and carried them to a van with Moore. The prosecution also presented testimony from Detective Patrick Lane. In a police interview, Bowden told Detective Lane he heard Moore say he was "going to get the dude back." Detective Lane also testified that Bowden said Harris was "pumping up" Moore to get revenge against Rivers's boyfriend.

Ernest Bowman testified two individuals made Molotov cocktails in the laundry room behind the apartment complex and said he saw Moore and Harris carry the Molotov cocktails to a parked van and drive away together. On direct examination, Bowman identified Harris as one of the men actually making the Molotov cocktails, but conceded on cross-examination that Harris had just been standing in the doorway to the laundry room while two other men made the Molotov cocktails.

The jury found Harris guilty on both counts of first degree murder and of arson causing great bodily injury, but not guilty of attempted murder. The jury also found true all the charged special circumstances that the murders were committed by means of a destructive device, were committed during the commission of arson, and constituted multiple murders.

The trial court denied Harris's motion for new trial. The court concluded the verdict was valid on a felony murder theory: "from what the jury came up with, [Harris] basically was an aider and abettor, as far as the arson is concerned."

The People recommended a sentence of life without the possibility of parole. The trial court sentenced Harris to a term of 25 years to life for each murder count, reasoning, "I know the

8

People tried to show that the defendant may have thrown [a Molotov cocktail]. But there's just no evidence of that at all." The court also observed, "both the jury and I personally feel that [Harris] did not intend the happening that did occur," and that the court "would have had a problem with the case if the jury based their decision on any kind of finding by innuendo that this defendant intended these babies [or Rivers] be killed or injured." The trial court further sentenced Harris to a consecutive determinate term of seven years for the arson. On appeal, we affirmed the judgment. (*People v. Harris* (Dec. 17, 1998, B118894) [nonpub. opn.].)

D.     *Moore Files a Section 1172.6 Petition, Which Is Denied at the Prima Facie Stage*

On January 24, 2022, Moore filed a petition for resentencing pursuant to section 1172.6. The petition alleged, in relevant part: (1) that Moore was prosecuted under the theory of felony murder, the natural and probable consequences doctrine, or other theory under which malice was imputed based solely upon his participation in a crime; (2) that he was convicted of murder or attempted murder under the felony-murder rule, the natural and probable consequences doctrine, or any other theory under which malice is imputed . . . based solely on [his] participation in a crime . . ."; (3) that he could not presently be convicted of murder or attempted murder because of changes made to sections 188 and 189, effective January 1, 2019; and (4) having presented a facially sufficient petition, he requested appointment of counsel. The superior court appointed counsel and the People opposed the petition.

9

The court issued a tentative decision denying the petition because the record of conviction showed Moore was the actual killer. Moore's counsel filed an "SB 1437 Merit Brief" arguing the superior court improperly engaged in fact finding at the prima facie stage and that the evidence did not establish Moore was a major participant who acted with reckless indifference to life.

The superior court denied Moore's petition, concluding Moore was ineligible for relief under section 1172.6 because he was the actual killer. The court determined the record of conviction established the jury found Moore personally threw the firebomb through the window when it found true the section 12022.7, subdivision (a), special allegation that Moore personally inflicted great bodily injury in the attempted murder of Rivers. The court explained, "the jury may well have concluded that Petitioner only intended to kill Ms. Rivers and not her two young children. The jury may have relied on an arson felony murder theory as to the two children. However, the evidence established that it was the firebomb that ignited the fire . . . killing the children. Therefore, by throwing the firebomb, Petitioner was the actual killer."

Moore timely appealed.

E. *Harris's Section 1172.6 Petition Is Denied After an Evidentiary Hearing*

On February 13, 2019, Harris petitioned for resentencing pursuant to former section 1170.95 (current section 1172.6). The superior court denied Harris's petition at the prima facie stage. Harris appealed and this court reversed with directions to the superior court to issue an order to show cause and to conduct an

10

evidentiary hearing. (See *People v. Harris* (2021) 60 Cal.App.5th 939, 961 (*Harris I*).)

The superior court conducted the evidentiary hearing on January 23 and February 15, 2023. The parties submitted briefing before the hearings. The People argued in their brief that the evidence proved beyond a reasonable doubt Harris was guilty of murder under current law as an aider and abettor who acted with malice aforethought and as a major participant who acted with reckless indifference to human life.

Harris argued he could not currently be convicted of murder under felony murder principles or any alternate theory of liability in which malice was imputed. He further argued the People's evidence against him was based on testimony that was recanted, biased, and contradicted. Harris sought to introduce new testimony from Cleveland "Bam" Mouton.[4]

In a sworn declaration, Mouton stated he had known Moore since the ninth grade and had personal knowledge of the crimes against Rivers and her children. Mouton explained that, in the course of their investigation, the police accused him and his "associates," including Bowman and Bowden, of firebombing Rivers's apartment. As a result, "[a]t Caleb Harris' trial I pleaded the 5th and chose not to testify and exculpate Caleb because I was personally present at this offense." Mouton stated in his declaration that he had knowledge that "Bowden lied to police about Caleb's involvement because I was present during

---

[4] Harris also submitted a declaration by Lolita Jennings, Bowman's then-girlfriend. Jennings repeated her trial testimony that she did not see Harris at the Eucalyptus apartments on the day of the murders. Jennings did not appear at the resentencing hearings.

11

this crime and Caleb was not there." Mouton also stated, that Bowman told him that Bowman lied to the police about Harris's involvement "following [Bowman's] unrelated arrest in order to get the benefit of serving less time."

At the hearing, the People orally moved to exclude Mouton's testimony because the "sole purpose [to admitting Mouton's testimony] is to argue to the court that [Harris] didn't commit a crime" and "the statute itself does not contemplate re-litigating issues such as identification." Harris's counsel denied any intention to invoke an identity defense at the evidentiary hearing; he asserted the issue of identity was raised in Harris's separate habeas petition. Counsel argued Mouton's testimony was relevant to Harris's state of mind, his level of participation in the crime, and whether Harris had sufficient influence over Moore. The superior court granted the People's motion to exclude Mouton's testimony, concluding, "[i]t appears that this testimony would lend itself solely to an identity, 'I wasn't there,' type of defense, which is not a relevant factor under the 1170.6 rubric."

After the parties presented their arguments, the superior court denied Harris's petition, stating as follows:

> "If you look at the role that the defendant had in the
> planning, the facts indicate that the petitioner helped
> fill beer bottles with gasoline, and put cut up bed
> sheets into it. The petitioner encouraged Moore to
> get revenge for an earlier act by Del[l]ano. He was
> involved in the planning and preparation of the
> arson. If you look at the role the defendant had or
> petitioner had in supplying or using the lethal
> weapons, the facts are he took part in the creation of

the murder weapons. . . . The defendant was aware of the dangers posed by this, even though he was the youthful age of 17, I find that he had awareness of the danger of the particular dangers posed by the nature of this weapon. After the lethal force in this case was used, it's clear that the defendant fled with knowledge of what had occurred. Based on all of these factors, again, I find that after reviewing the *Banks* factors, after looking at the laws that currently exist now, under 1172[.6] I find the People have met their burden beyond a reasonable doubt to prove that he could still be convicted of these two murders."

Harris timely appealed.

## DISCUSSION

A.    *The Superior Court Properly Denied Moore's Petition for Resentencing Under Section 1172.6 at the Prima Facie Stage*

1.    *Governing Law and Standard of Review*

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and significantly limited the scope of the felony murder rule by amending sections 188 and 189. (See *People v. Reyes* (2023) 14 Cal.5th 981, 984 (*Reyes*); *People v. Strong* (2022) 13 Cal.5th 698, 707-708 (*Strong*); *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).) Section 188, subdivision (a)(3), now prohibits imputing

13

malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony murder rule in section 189, subdivision (e).  Section 189 now requires the People to prove the defendant was the actual killer (§ 189, subd. (e)(1)); an aider and abettor to murder who had the intent to kill (§ 189, subd. (e)(2)); or a major participant in an underlying felony listed in section 189, subdivision (a), who acted with reckless indifference to human life as described in subdivision (d) of section 190.2 (§ 189, subd. (e)(3)).  (See *People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*); *People v. Wilson* (2023) 14 Cal.5th 839, 868-869.)

Senate Bill No. 1437 also provided a procedure in section 1172.6 for an individual convicted of felony murder or murder under the natural and probable consequences theory to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if the individual could not have been convicted of murder under the changes to sections 188 and 189.  (See *Lewis, supra,* 11 Cal.5th at p. 959.)

Section 1172.6 sets out the following sequence:  "a complying petition is filed; the court appoints counsel, if requested; the issue is briefed; and then the court makes one . . . prima facie determination."  (*Lewis, supra*, 11 Cal.5th at p. 966; see § 1172.6, subds. (b)-(c).)  "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'"  (*Lewis,* at p. 972.)  Rather, at the prima facie review stage, the court's review is limited to "'readily ascertainable facts'" in the record, such as the jury instructions, the record of the crimes committed, and jury findings on the enhancements.  (*People v. Duchine* (2021) 60 Cal.App.5th 798,

14

815; see *Curiel*, supra, 15 Cal.5th at pp. 453-454 [relevant jury finding is generally preclusive in section 1172.6 proceedings]; accord, *Strong, supra*, 13 Cal.5th at p. 710; *People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, 1241 (*Beaudreaux*).) "[T]he 'prima facie bar was intentionally and correctly set very low.'" (*Lewis*, at p. 972; accord, *People v. Langi* (2022) 73 Cal.App.5th 972, 979-980; see *People v. Lopez* (2023) 88 Cal.App.5th 566, 576 ["It is only where the record of conviction establishes the petition lacks merit *as a matter of law* that the court may deny the petition without a hearing."].)

We independently review the superior court's prima facie determination under section 1172.6. (See *People v. Williams* (2022) 86 Cal.App.5th 1244, 1251; *People v. Harden* (2022) 81 Cal.App.5th 45, 52 (*Harden*).)

2.      *The Record of Conviction Establishes Moore Is Ineligible for Relief as a Matter of Law Because He Was the Actual Killer*

The jury found true "the allegation that in the commission and attempted commission of the above [attempted murder] offense the said defendant, Dwayne Arthur Moore, with the intent to inflict such injury, personally inflicted great bodily injury upon Valerie Ann Rivers within the meaning of Penal Code section 12022.7(a)."[5]

"'[T]he meaning of the statutory requirement that the defendant *personally inflict* the injury does not differ from its nonlegal meaning.'" (*People v. Martinez* (2014) 226 Cal.App.4th

---

[5]      The current version of section 12022.7, subdivision (a), no longer requires an intent to inflict great bodily injury. This change in the statute does not alter our analysis.

15

1169, 1184.) "[I]n enacting section 12022.7, the Legislature intended the designation 'personally' to limit the category of persons subject to the enhancement to those who directly perform the act that causes the physical injury to the victim." (*People v. Cole* (1982) 31 Cal.3d 568, 579.) "'Commonly understood, the phrase "personally inflicts" means that someone "in person" [citation], that is, directly and not through an intermediary, "cause[s] something (damaging or painful) to be endured."'" (*Martinez,* at p. 1184, quoting *People v. Cross* (2008) 45 Cal.4th 58, 68; accord, *People v. Slough* (2017) 11 Cal.App.5th 419, 423 (*Slough*).) "Accordingly, 'one who merely aids, abets, or directs another to inflict the physical injury is not subject to the enhanced penalty of section 12022.7.'" (*Slough,* at p. 423.) Further, "a relevant jury finding is generally preclusive in section 1172.6 proceedings, i.e., it 'ordinarily establish[es] a defendant's ineligibility for resentencing under Senate Bill 1437 and thus preclude[s] the defendant from making a prima facie case for relief.'" (*Curiel, supra,* 15 Cal.5th at pp. 453-454, quoting *Strong, supra*, 13 Cal.5th at p. 710.)

The jury's verdict demonstrates the jury found that Moore committed the crime of attempted murder against Rivers by throwing the Molotov cocktail into her apartment. Although this true finding was attendant to the attempted murder charge in count 3 and not to the murder charges in counts 1 and 2, at trial the evidence was uncontroverted that the children died as a result of the firebombing. The prosecution argued in closing that Moore threw a Molotov cocktail through Rivers's window and that Moore was the actual killer of the children. Moore's trial counsel conceded that "these two children died as the result of the arson fire" and "[y]ou will never hear Mr. Moore or the defense in

16

this case try and tell you that the deaths were caused by something other than that." The jury additionally found true the special allegation that Moore committed murder "by means of a destructive device that said defendant delivered, attempted to deliver, and caused to be delivered." This true finding further indicates the jury directly linked Moore to the firebomb that caused the children's deaths.

Given the jury instructions and verdicts, and the personal-infliction-of-great-bodily-injury enhancement, the record of conviction establishes Moore was convicted as the actual killer without the need to engage in factfinding, weigh conflicting evidence, or make credibility determinations. "As a matter of law, resentencing relief under section 1172.6 is not available to an 'actual killer.'" (*People v. Garcia* (2022) 82 Cal.App.5th 956, 973; accord, *People v. Bodely* (2023) 95 Cal.App.5th 1193, 1201.)

*Harden, supra,* 81 Cal.App.5th at page 47, is instructive. There, the superior court summarily denied relief under former section 1170.95 (now section 1172.6) because "the jury instructions and verdicts *conclusively establish*—with no factfinding, weighing of evidence, or credibility determinations— that in 2001 [the petitioner] was convicted as the actual killer." (*Harden,* at p. 47.) The *Harden* jury was instructed on murder, felony murder, special circumstances, and personal infliction of great bodily injury, but not on the natural and probable consequences doctrine or aiding and abetting. The jury convicted the defendant of murder with special circumstances—that she committed murder while engaged in the commission of robbery and burglary and that in the commission of these crimes, she personally inflicted great bodily injury pursuant to section 12022.7. (See *Harden,* at p. 55.)

17

*Harden* concluded, "The instructions and verdicts show the only path to convicting [the defendant] of first degree felony murder with special circumstances and a personal-infliction-of-great-bodily-injury enhancement was based on a finding she actually killed [the victim]." (*Harden, supra,* 81 Cal.App.5th at p. 56; see *Beaudreaux, supra,* 100 Cal.App.5th at p. 1247 [despite felony murder instruction, "reading all the charges, the instructions, the verdicts, and the findings as a whole, we see no legal route [the defendant's] jury could have taken to convict him without finding he was [the victim's] actual killer"].)

Moore's attempt to distinguish *Harden* because the *Harden* jury was not instructed on aiding and abetting principles is unavailing. In *Harden,* the prosecutor decided not to request an aiding and abetting instruction because there was no evidence of a second perpetrator. (*Harden, supra,* 81 Cal.App.5th at p. 53.) *Harden* noted it was "certainly not dispositive" that aiding and abetting instructions would have left open the possibility that at least one juror convicted the defendant of felony murder on a theory other than that of being the actual killer. (*Ibid.*) *Harden*'s holding that jury instructions and verdicts, and a finding of a personal-infliction-of-great-bodily-injury enhancement means the record of conviction can establish ineligibility for section 1172.6 relief as a matter of law remains instructive. (See *Harden,* at p. 56.)

Relatedly, Moore contends the superior court engaged in impermissible judicial factfinding at the prima facie stage by applying the jury's true finding for the attempted murder count to the two murder counts. He recites the superior court's statement that "[t]he evidence at trial established that Petitioner threw a firebomb through an apartment window, horribly

18

injuring Valerie Rivers and burning to death her [two children]."
According to Moore, the superior court was not entitled to make a
factual finding that the same act (throwing the firebomb) that
was the basis for the jury's verdict as to the personal infliction of
great bodily injury in count 3 also caused the death of the murder
victims in counts 1 and 2.

"In reviewing any part of the record of conviction at this
preliminary juncture, a [superior] court should not engage in
'factfinding involving the weighing of evidence or the exercise of
discretion.'" (*Lewis, supra,* 11 Cal.5th at p. 972.)  But here, the
superior court did not consider conflicting evidence or make
credibility determinations to reach the conclusion that the same
act caused both Rivers's great bodily injury and her children's
deaths.[6]  (See *People v. Delgadillo* (2022) 14 Cal.5th 216, 233

---

[6]    We reject Moore's argument that a dispute of fact was
noted by this court in its previous opinion from Moore's direct
appeal.  Moore cites our conclusion that Harris's extrajudicial
statement that he was present at the scene of the crime "'*did not
even necessarily indirectly implicate* appellant [Moore] when
considered with the rest of the evidence . . ., it is not at all
apparent from Harris's statement appellant, rather than a third
party, was the one who threw the Molotov cocktails.' (*People v.
Moore*, B112631, slip opinion page 27, italics added.)"  This
observation was made in response to Moore's argument that
Harris's extrajudicial statement somehow implicated Moore and
was inadmissible under *Bruton v. United States* (1968) 391 U.S.
123 and *People v. Aranda* (1965) 63 Cal.2d 518.  We merely
observed Harris's statement did not identify Moore or otherwise
implicate him.  Our observation was not a conclusion that the
evidence was disputed as to whether Moore threw the firebomb or
whether Rivers's great bodily injury and the children's deaths
were caused by the same firebomb.

[affirming summary denial at prima facie stage where uncontradicted facts were that petitioner was driving on wrong side of road while intoxicated, causing death].) Here, it is undisputed the firebombing killed the children, and the jury found Moore threw the Molotov cocktail that started the fire. The court did not engage in any factfinding under these circumstances.

Moore also argues the jury's true finding of personal infliction of great bodily injury does not render him ineligible for resentencing under section 1172.6 as a matter of law. In support, he cites *People v. Offley* (2020) 48 Cal.App.5th 588, 598 (*Offley*), *People v. Davenport* (2021) 71 Cal.App.5th 476, 485-486 (*Davenport*), and *People v. Elder* (2014) 227 Cal.App.4th 411, 424 (*Elder*), but these cases are distinguishable and do not stand for the proposition advanced by Moore.

*Offley* addressed personal use of a firearm pursuant to section 12022.53, subdivision (d).[7] *Offley* determined the jury's finding the defendant had personally used a gun did not render him ineligible for relief under section 1172.6 as a matter of law. It held the jury might have concluded the petitioner intended only to commit an assault with the aim of injuring or frightening the victim and if so, may have convicted the defendant of murder under the natural and probable consequences doctrine. (See

_____

7      Section 12022.53, subdivision (d), provides: "Notwithstanding any other law, a person who, in the commission of a [specified] felony . . . personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to a person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

*Offley, supra,* 48 Cal.App.5th at p. 599.)  But here, the jury was not instructed under the natural and probable consequences doctrine.

In *Davenport,* the defendant pleaded no contest to the personal use of a firearm enhancement under section 12022.5, subdivision (a).  *Davenport* concluded the personal use of a firearm admission did not preclude the possibility of prosecution under a now invalid felony murder theory.[8]  (See *Davenport, supra,* 71 Cal.App.5th at pp. 485-486.)  "'"Personally uses a firearm"'" in the context of section 12022.5 includes the intentional display of the weapon in a menacing manner, to intentionally fire it, or to intentionally strike or hit a human being with it.  (*People v. Johnson* (1995) 38 Cal.App.4th 1315, 1319.)  Unlike the jury's finding here, Davenport's plea of no contest to personal use of a firearm did not establish as a matter of law that he was the actual killer, had the intent to kill and aided or abetted the actual killer, or was a major participant in the underlying felony and acted with reckless indifference to human life.

And *Elder* did not involve section 1172.6 resentencing, but was a direct appeal that addressed whether a defendant could be convicted of the personal infliction of great bodily injury enhancement if the victim dislocated his own finger trying to prevent the defendant's escape.  (See *Elder, supra,*

---

[8]    Section 12022.5, subdivision (a), provides:  "Except as provided in subdivision (b), any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense."

227 Cal.App.4th at p. 424.) *Elder* set out the parameters of when the enhancement could be imposed and did not discuss whether a jury's true finding of the enhancement could establish as a matter of law that the defendant was the actual killer.

Moore next contends the instructions relating to the murder counts allowed the jury to convict him as an aider and abettor who did not harbor an intent to kill, rendering him eligible for relief under section 1172.6.

But here, the aiding and abetting instructions did not open up the possibility a juror might have convicted Moore on a theory other than being the actual killer. That is because the aiding and abetting instructions should be viewed in the context of the jury instructions as a whole and the entire trial. (See *Cupp v. Naughten* (1973) 414 U.S. 141, 146-147 ["In determining the effect of this instruction on the validity of respondent's conviction, we accept at the outset the well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. [Citation]. . . . [A] judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction."]; *People v. Haskett* (1990) 52 Cal.3d 210, 235 ["'we follow the familiar rule stated in *Cupp*'"].) At closing, the prosecutor advised the jury he was proceeding on a theory Moore was the actual killer who threw the Molotov cocktail, and Harris aided and abetted the murder. The court instructed the jury that if it

22

found Moore was the actual killer, it did not have to find an intent to kill. The verdict form also required the jury to determine whether the defendant did personally inflict great bodily injury on Rivers. As discussed, the jury's finding that Moore personally inflicted great bodily injury on Rivers in connection with the attempted murder count meant that the jury found Moore was the actual killer who threw the Molotov cocktail that killed the children; this finding is consistent with the prosecution's theory of liability and the court's instructions.

In sum, the superior court did not err by summarily denying Moore's section 1172.6 petition.

B. *Harris Is Entitled to a New Evidentiary Hearing Under Section 1172.6*

1. *Governing Law and Standard of Review*

If the petitioner makes the requisite prima facie showing he is entitled to relief under section 1172.6, the superior court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts. (See § 1172.6, subds. (c) & (d)(1).) Section 1172.6, subdivision (d)(3), provides that at the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially

23

noticed. . . . The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)

As stated, section 189, subdivision (e), now requires the People to prove the defendant was the actual killer, an aider and abettor to murder, or a major participant in an underlying felony who acted with reckless indifference to human life. (See *Curiel, supra,* 15 Cal.5th at p. 448.) *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) "substantially clarified the law surrounding major participant findings," and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) "substantially clarified the relevant considerations for determining whether a defendant has acted with reckless indifference to human life." (*Strong, supra*, 13 Cal.5th at p. 721.)

*Banks* specified that courts should consider: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted.)

In *Clark,* the high court analyzed the subjective and objective elements to determine whether a defendant acts with reckless indifference to human life, including: was the defendant aware that weapons would be used; did the defendant himself or herself use the weapon; did the defendant have an opportunity to reduce the overall risk of violence during the felony or to aid the

24

victim; did the defendant know his cohorts were likely to use lethal force? (See *Clark, supra*, 63 Cal.4th at pp. 618-622.) The high court observed these elements largely overlap with the "major participant" analysis. (*In re Scoggins* (2020) 9 Cal.5th 667, 676-677.) "'Although we state these two requirements separately, they often overlap,'" "'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*Clark,* at p. 615.)

"We review a trial court's rulings on the admission and exclusion of evidence under the abuse of discretion standard." (*People v. Thompson* (2010) 49 Cal.4th 79, 128.) "Of course, in a section [1172.6] petition, the trial judge isn't charged with holding a whole new trial on all the elements of murder. Instead, the parties will focus on evidence made relevant by the amendments to the substantive definition of murder." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*); accord, *People v. Vargas* (2022) 84 Cal.App.5th 943, 952 (*Vargas*); see *People v. Daniel* (2020) 57 Cal.App.5th 666, 678 [rejecting argument that section 1172.6 "authorizes a defendant to present new evidence to undermine a jury's finding of guilt under a particular theory of murder, effectively retrying the case"].)[9]

---

[9]    Harris asserts the resentencing hearings in *Clements* and *Vargas* took place in 2021, when the statute did not allow for the introduction of new or additional evidence at the evidentiary hearing. In 2021, section 1172.6 was numbered section 1170.95. Subdivision (d)(3) of that section expressly provided that at the evidentiary hearing, "[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens."

25

We review the superior court's decision to deny the petition after an evidentiary hearing for substantial evidence, provided the court understood the elements of the offense and applied the proper standard and burden of proof. (See *Reyes, supra*, 14 Cal.5th at p. 988; *Vargas, supra,* 84 Cal.App.5th at p. 951.)

2. *The Superior Court Prejudicially Erred When It Excluded Mouton from Testifying*

Harris contends the superior court abused its discretion when it excluded Mouton's proffered testimony. According to Harris, Mouton's personal knowledge of the events at the Eucalyptus apartments and Rivers's apartment was sufficient to render Mouton's testimony relevant and admissible. Specifically, Harris argues that Mouton's testimony was relevant to determine the level of Harris's participation in the arson, Harris's state of mind, and the reliability of Bowden's and Bowman's testimony, all of which are relevant to the *Banks* and *Clark* factors. Harris's contention has merit, in particular because on appeal, the People do not contend Harris was the actual killer or that he aided and abetted with the intent to kill. They instead contend the evidence was overwhelming that he acted as a major participant with reckless disregard for human life.

Section 1172.6, subdivision (d)(3), provides that the admission of evidence at an evidentiary hearing is governed by the Evidence Code, which specifies that only relevant evidence is admissible at trial. (See Evid. Code, § 350.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The test of

26

relevance is whether the evidence tends to logically, naturally and by reasonable inference establish material facts such as identity, intent, or motive. (See *People v. Williams* (2008) 43 Cal.4th 584, 633-634.)

Section 1172.6, subdivision (d)(3), also places the burden on the People to prove beyond a reasonable doubt that Harris was guilty of murder under current law. The People acknowledge their burden: "at the evidentiary hearing, the prosecution need only prove either that a petitioner acted with actual malice under the amended section 188, subdivisions (a)(1) and (a)(2), or that his conduct satisfied the amended elements of felony murder under section 189, subdivision (e)." In other words, the People were required to prove malice, or that Harris was a major participant who acted with reckless indifference to human life.

As we explained in our opinion in *Harris I,* an evidentiary hearing was necessary because some of the factors under *Banks* and *Clark* to determine whether Harris was a major participant who acted with reckless indifference to human life were disputed at trial and not clearly resolved by the jury's findings.

Under *Banks* and *Clark,* evidence of Harris's presence at the scene of the crime was plainly relevant to whether he was a major participant in the underlying felony who acted with reckless indifference to human life. The United States Supreme Court has "stressed the importance of presence to culpability." (*Clark, supra*, 63 Cal.4th at p. 619, citing *Tison v. Arizona* (1987) 481 U.S. 137, 158.) Where "the murder is a culmination or a foreseeable result of several intermediate steps . . . , 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an

27

opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.'" (*Clark*, at p. 619.) Harris's potential absence from Rivers's apartment (to which Mouton would have testified) would have demonstrated a different level of participation in the crime than if Harris had been present. Further, it was established at trial that Mouton was present at the Eucalyptus apartments and he could also have testified as to Harris's conduct there.

In short, Harris's state of mind, the level of his participation in the crime, and Bowden and Bowman's reliability were disputed facts of consequence at the evidentiary hearing. Mouton's testimony was relevant and admissible as to these issues. As a result, we are not persuaded by the People's argument that Mouton's proffered testimony was limited to the issue of identity and therefore irrelevant to the issues at the evidentiary hearing.

The People contend that even if the court erred when it excluded Mouton's testimony, any error was harmless because the record "overwhelmingly" demonstrates Harris was a major participant in the underlying arson and that he acted with reckless indifference to human life. In support, the People cite to the "mutually corroborating evidence" found in Bowman's and Bowden's testimony that Harris was involved in preparing and transporting the Molotov cocktails as well as his presence at the scene of the crime.

We apply the "'reasonable probability'" test of *Watson, supra*, 46 Cal.2d at page 836 to determine whether the exclusion of Mouton's testimony was harmless. (*People v. Robinson* (2005) 37 Cal.4th 592, 627.) We conclude it is reasonably probable

28

Harris would have obtained a more favorable decision had Mouton's testimony been admitted. As stated, the degree of Harris's culpability was disputed at trial and was not clearly resolved by the jury's findings. Mouton's proffered testimony that Harris was absent from the scene of the crime was relevant and material to whether Harris was a major participant in the underlying felony and acted with reckless indifference to human life under *Banks* and *Clark*. Mouton also indicated he would testify to Bowman's and Bowden's lack of credibility. We conclude the exclusion of Mouton's testimony was prejudicial and reverse and remand for a new evidentiary hearing.[10]

3. *Harris Does Not Establish Grounds for Judicial Disqualification Under Code of Civil Procedure Section 170.1*

Harris requests that we direct any further proceedings to a different judge pursuant to Code of Civil Procedure section 170.1, subdivision (c). That provision states that, "At the request of a party or on its own motion an appellate court shall consider whether in the interests of justice it should direct that further

---

[10] In light of our reversal and remand, we do not reach Harris's additional contentions that the superior court: considered inadmissible hearsay testimony by Detective Lane; found that Harris harbored an intent to kill even though such finding was not supported by the record; and, failed to consider his youth at the time of the offense.

29

proceedings be heard before a trial judge other than the judge whose judgment or order was reviewed by the appellate court."[11]

Appellate courts must exercise the power to disqualify sentencing judges "sparingly and only where the interests of justice require it." (*People v. Gulbrandsen* (1989) 209 Cal.App.3d 1547, 1562 (*Gulbrandsen*); accord, *Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1256-1257.) "Disqualification may be necessary where the sentence of the original judge indicates an animus inconsistent with judicial objectivity. It may also be called for where the judge's failure to follow the sentencing rules suggests a whimsical disregard of the sentencing scheme that is incompatible with a judicious effort to comply with its complex terms. But mere sentencing error, given the complexity of the determinate sentencing scheme, does not justify removing the trial judge; a mere failure to comply with its requirements cannot be said to reflect a lack of objectivity implicating the interests of justice. Nor would sentence reversal in such a case be likely to cause the sentencing court to lose its objectivity." (*Gulbrandsen, supra*, at p. 1562, fn. omitted; see *Peracchi*, at pp. 1256-1257 [remand to different judge may be necessary where the ruling or sentence of the original judge indicates an animus inconsistent with judicial objectivity or whimsical disregard of the law].)

Harris questions the superior court judge's impartiality and ability to comply with this Court's direction to "proceed consistently" with section 1172.6 on remand. In particular, Harris faults the superior court judge's decision to exclude his only new witness and for contradicting its own determination at

---

[11] Certain sections of the Code of Civil Procedure, including section 170.1, apply to both civil and criminal proceedings. (See *People v. Superior Court* (*Laff*) (2001) 25 Cal.4th 703, 729, fn. 12.)

the prima facie stage that Harris did not display an intent to kill. Neither of these decisions indicates judicial animus or a "whimsical disregard" for the requirements of section 1172.6. "'[A] judge's "rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review."'" (*People v. Silveria* (2020) 10 Cal.5th 195, 320, fn. omitted.) Accordingly, we decline Harris's Code of Civil Procedure Section 170.1 request.

## DISPOSITION

The order denying Moore's petition for resentencing pursuant to section 1172.6 is affirmed.

The order denying Harris's petition for resentencing pursuant to section 1172.6 is reversed and the matter is remanded for an evidentiary hearing pursuant to section 1172.6, subdivision (d). We further direct the court to vacate its order granting the People's motion to exclude Mouton from testifying and to enter a new order denying the motion so Mouton may be allowed to testify at Harris's evidentiary hearing.


MARTINEZ, P. J.

We concur:


SEGAL, J.                    PULOS, J.*

---

\* Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.